IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LYNNE C. QUIGLEY, et al.

    v.                       :   Civil Action No. DKC 11-3223

UNITED STATES OF AMERICA, et al.

## MEMORANDUM OPINION

Presently pending and ready for review in this consolidated tort action is the motion to dismiss or, in the alternative, for summary judgment filed by Defendant the United States of America ("United States" or "the Government") (ECF No. 42), as well as two motions for leave to file a surreply filed, respectively, by Defendant Montgomery County ("the County") and Plaintiffs Lynne C. Quigley, Miles C. Quigley, the estate of Joseph Quigley, Adriana Ochoa, and Pollyana Barbosa (ECF Nos. 78, 79). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the Government's motion will be granted in part and denied in part, and both motions for leave to file a surreply will be denied.

## I. Background

Three cases are consolidated in this action: *Quigley v. United States*, No. DKC 11-3223; *Ochoa v. United States*, No. DKC

11-3224; and *Barbosa v. United States*, No. DKC 11-3225.   The
following allegations are taken from the amended complaint (ECF
No. 44), unless otherwise indicated.

### A.   Factual Background

At some point during the overnight hours of January 19,
2009, a water main maintained by Defendant Washington Suburban
Sanitary Commission ("WSSC") burst under Ridge Drive near the
intersection of 64th Street in the Bethesda area of Montgomery
County, Maryland.   After the main ruptured, WSSC increased the
water pressure, which amplified the flow of water.[1]   Water from
the main escaped into the street, where it collected and flowed
into a storm drain at the intersection of Ridge Drive and 64th
Street.   Due to a breach in the storm drain, the water made its
way down a hillside and across a drainage ditch onto the
adjacent Clara Barton Parkway ("the Parkway"), a limited access
urban freeway maintained by the Government through its
Department of the Interior and National Park Service ("NPS").

On January 20, 2009, the temperature in the vicinity was
below freezing.   As a result, the water from the burst main that
had collected on the Parkway froze into ice.   The ice covered
both westbound lanes of the Parkway for approximately 200 yards.

---

[1] Upon learning of a broken main, it is the protocol of WSSC
to increase the water pressure to prevent water from backing up
within its system.   (ECF No. 21 ¶ 26; ECF No. 26 ¶ 26).

There was no appreciable rain, sleet, snow, or other precipitation in the area.

Around 5:24 a.m. that day, decedent Joseph Quigley was driving eastbound on the Parkway.  At about the same time, Defendant Marcelo Pepe was driving westbound.  Ms. Ochoa and Ms. Barbosa were passengers in Mr. Pepe's vehicle.  (ECF No. 21, at 3; ECF No. 26, at 3).  Mr. Pepe encountered the ice caused by the burst main, lost control of his vehicle, crossed the median into the eastbound lanes, and collided with Joseph Quigley's vehicle.  Joseph Quigley sustained injuries from which he eventually died.  In Mr. Pepe's vehicle, Ms. Ochoa sustained injuries.  (ECF No. 21 ¶ 32).  Ms. Barbosa, who was originally in the back seat, was ejected from the vehicle and landed on top of the burning exhaust system of the vehicle, all of which caused injuries and first-, second-, and third-degree burns. (ECF No. 26 ¶¶ 32, 35).

### B.    Procedural Background

On November 10, 2011, Lynne C. Quigley and Miles C. Quigley, individually and as personal representatives of the estate of Joseph Quigley ("the Quigley Plaintiffs"), brought a wrongful death and survival action against Defendants in this

court.   (ECF No. 1).[2]   At about the same time, Ms. Ochoa and Ms. Barbosa also filed complaints asserting identical causes of action.   (ECF Nos. 21, 26).   The County answered all three complaints separately.   (ECF Nos. 14, 23, 28).   Mr. Pepe filed one omnibus answer.   (ECF No. 39).[3]

The three cases were consolidated for all purposes by court order on January 4, 2012.   (ECF No. 20).   The court then granted the Quigley Plaintiffs' consent motion for leave to file an amended complaint.   (ECF No. 43).   The amended complaint contains seven counts:   (1) strict liability against WSSC; (2) negligence against WSSC and a Doe Defendant employee of WSSC; (3) strict liability against the County; (4) negligence against the County and a Doe Defendant employee of the County;[4] (5) negligence against the United States; (6) negligence against Mr. Pepe; and (7) liability of United Services Automobile Associated

---

[2] Federal jurisdiction is predicated on the Federal Tort Claims Act ("FTCA") claim against the United States, with supplemental jurisdiction as the basis for all other claims.

[3] Mr. Pepe re-filed his answer a little over a week later. (ECF No. 41).   It is unclear what, if any, differences there are between the two documents.

[4] On January 10, 2012, the parties entered into a stipulation in which the County and WSSC agreed that to the extent any of their employees were found responsible for the injuries in this matter, the County and WSSC, respectively, would "stand in the shoes of said employee(s), litigate, and be financially responsible for any judgment that may be entered against any employee(s)."   (ECF No. 30).

Casualty Insurance Co. ("USAA").   (ECF No. 44).[5]   USAA answered the amended complaint on March 28, 2012.  (ECF No. 54).

On February 24, 2012, the Government filed a motion to dismiss or, in the alternative, for summary judgment.  (ECF No. 42).  All Plaintiffs opposed the Government's motion.[6]  (ECF Nos. 59, 60, 62).  Additionally, the County filed a response to the motion.  (ECF No. 58).  On July 13, 2012, the Government replied.  (ECF No. 75).[7]

## II.  Federal Tort Claims Act ("FTCA")

The FTCA provides a limited waiver of the sovereign immunity of the United States with respect to certain types of tort actions.  *See* 28 U.S.C. §§ 1346(b), 2674.  Under the FTCA, the United States is liable, as a private person, for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting under the scope of his office or employment."  *Id*. § 1346(b).  As a waiver of sovereign immunity, the FTCA is to be narrowly construed and is not to be extended

---

[5] After a round of briefing, Count One as to all Plaintiffs and Count Two as to Ms. Barbosa were dismissed.  (ECF Nos. 50, 51).

[6] Ms. Ochoa and Ms. Barbosa adopted the Quigley Plaintiffs' arguments.

[7] On July 31, 2012, and August 3, 2012, the County and Plaintiffs, respectively, moved for leave to file surreplies. (ECF Nos. 78, 79).  Those motions will be denied.

by implication. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992); *see also Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990) ("This waiver permits suit only on terms and conditions strictly prescribed by Congress."). The potential liability of the United States under the FTCA is "qualified by a number of exceptions." *Holbrook v. United States*, 673 F.3d 341, 345 (4th Cir. 2012).

The Government argues that the discretionary function exception to the FTCA's waiver of sovereign immunity set forth in 28 U.S.C. § 2680(a) presents a jurisdictional bar to Plaintiffs' claims. (*See* ECF No. 42-1, at 8). The party bringing suit in federal court bears the burden of proving that subject-matter jurisdiction properly exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In a Federal Rule of Civil Procedure 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Evans*, 166 F.3d at 647. The court should grant a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768.

"The discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'"  *Id.* (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).[8]  Under the exception, the United States may not be held liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  Plaintiffs bear the burden of showing that the discretionary function exception does not apply.  *See Indem. Ins. Co. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009). "If the discretionary function exception does apply, the district court must dismiss the affected claims for lack of subject matter jurisdiction."  *Id.*

Determining whether an act is discretionary under the FTCA may involve a two-step process.  First, conduct by a federal employee falls within the discretionary function exception when it "'involves an element of judgment or choice.'"  *Holbrook*, 673

_____

[8]  The Fourth Circuit has called this exception the "most important" exception to the FTCA.  *McMellon v. United States*, 387 F.3d 329, 335 (4th Cir. 2004) (en banc).

F.3d at 345 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).   "'[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' because 'the employee has no rightful option but to adhere to the directive.'"   *Indem. Ins. Co.*, 569 F.3d at 180 (quoting *Berkovitz*, 486 U.S. at 536).   Second, "even if 'the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield,' that is, decisions 'grounded in social, economic, and political policy.'"   *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 208 (4th Cir. 2002) (quoting *Berkovitz*, 486 U.S. at 537).   In considering this step, the court does not focus on "the agent's subjective intent in exercising the discretion, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).   In other words, analysis under the second prong of the discretionary function exception is not a fact-intensive exercise, as the court will only "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993).   "Where . . . a regulation authorizes or

requires employee discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Holbrook*, 673 F.3d at 345 (quoting *Gaubert*, 499 U.S. at 324).

Here, Plaintiffs advance two theories of the Government's negligence, which, they argue, resulted from the nondiscretionary acts of agents of the United States. First, they complain that the United States failed "to exercise reasonable care to patrol the Parkway on January 20, 2009, and recognize, appreciate, guard against, and/or warn motorists of the ice hazard on the Parkway's travel lanes." (ECF No. 44 ¶ 49). Second, they complain that the United States failed "to exercise reasonable care to maintain the Parkway and its lands adjacent thereto, including the storm drain on the hillside below Ridge Drive and the Parkway's drainage facilities." (*Id.*).

## A.    Negligent Patrol

As to Plaintiff's first theory of negligence, the Government notes that Plaintiffs cannot "point to . . . any mandatory federal statutes, regulations or directives applicable to how the [United States Park Police] should conduct patrols of its roadways, including but not limited to the [Parkway]." (*Id.* at 12). The Government observes that, in fact, the powers of NPS are broadly defined by statute. Of relevance here, the NPS

> shall promote and regulate the use of the
> Federal areas known as national parks,
> monuments, and reservations . . . , as
> provided by law, by such means and measures
> as conform to the fundamental purpose . . .
> to conserve the scenery and the natural and
> historic objects and the wild life therein
> and to provide for the enjoyment of the same
> in such manner and by such means as will
> leave them unimpaired for the enjoyment of
> future generations.

16 U.S.C. § 1. Furthermore, the NPS has the following policy regarding safety: "The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing." National Park Service, *Management Policies 2006* § 8.2.5.1 (2006).

Plaintiffs attempt to recast the relevant conduct as the failure of NPS to *warn* drivers about the ice patch on the Parkway rather than the failure of NPS to *patrol* the Parkway. (*See* ECF No. 59, at 10). To that end, Plaintiffs point to a statement in the declaration of Lt. Gregory Monahan, which was submitted by the Government, that "[w]hen an officer [patrolling the Parkway] observes a hazard, he is instructed to take action depending on the severity of the hazard, that could include notifying [Parkway] maintenance crews or establishing traffic control measures." (ECF No. 42-3, Monahan Decl., ¶ 7). According to Plaintiffs, this vague reference to an instruction "is the product of some agency rule, policy or protocol," which

10

takes the action of NPS outside of the discretionary function
exception to the FTCA.  (ECF No. 59, at 10).

With respect to prong one of the discretionary function
exception, Plaintiffs' reasoning is flawed.  To begin, their
construction of the relevant conduct is too narrow.  In *Autery
v. United States*, 992 F.2d, 1523 (11th Cir. 1993), the Eleventh
Circuit confronted an analogous situation in which the practice
of NPS of identifying and removing hazards from roadways was
challenged.  The Eleventh Circuit stated:  "It is the governing
administrative policy, not the Park Service's knowledge of
danger, . . . that determines whether certain conduct is
mandatory for purposes of the discretionary function exception.
The FTCA expressly provides that the exception applies to policy
judgments, even to those constituting abuse of discretion."
*Autery*, 992 F.2d at 1528 (internal quotation marks omitted);
*accord Merando v. United States*, 517 F.3d 160, 167 (3[d] Cir.
2008).  Even though *Autery* concerned the removal of dangerous
trees, the underlying principle is still applicable here.
Whether the NPS would have been required to report the ice patch
if they had seen it is irrelevant to the analysis.  *See Merando*,
517 F.3d at 173.  The relevant inquiry is whether controlling
statutes, regulations, or administrative policies mandated that
the NPS patrol for dangerous road conditions in a specific
manner.  *See Autery*, 992 F.2d at 1528.  In this case, Plaintiffs

do not, as is their burden, identify any actual directive dictating when or how the NPS is supposed to patrol the Parkway generally, let alone when or how to report instances of icy conditions. *See Indem. Ins. Co.*, 569 F.3d at 180. Without more, it cannot be said that, based on these circumstances, the action of NPS did not "involve[] an element of judgment or choice." *See Holbrook*, 673 F.3d at 345.

With respect to prong two of the discretionary function exception, the patrolling of the Parkway is "susceptible to policy analysis." *See Gaubert*, 499 U.S. at 325. Indeed, the Management Policies of NPS "require[] employee discretion" regarding public safety concerns; therefore, "it must be presumed that the acts [of NPS] are grounded in policy." *See Holbrook*, 673 F.3d at 345 (internal quotation marks omitted). Bolstering this conclusion are cases in which courts have agreed that it is sound to protect from suit how law enforcement addresses security issues. *See, e.g., Attalah v. United States*, 758 F.Supp. 81, 89-91 (D.P.R. 1991) (collecting cases). Thus, prong two of the discretionary function exception is satisfied.

Separately, Plaintiffs argue that further discovery is warranted regarding "records setting forth the procedures to be followed in routine patrol of the [Parkway]." (ECF No. 59, at 11). In particular, they seek production of a "212-page record" that the Government identified as responsive but exempt pursuant

to a Freedom of Information Act request submitted by Plaintiffs. (*See id.*).   "[T]he decision of whether or not to permit jurisdictional discovery is a matter committed to the sound discretion of the district court."   *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 216 n.3 (4th Cir. 2002).   The Government offered to produce the 212 pages of target documents under seal to Plaintiffs in connection with its reply, but Plaintiffs rejected this offer.   (ECF No. 75, at 25 n.15).   Plaintiffs do not contest this assertion, nor do they explain why this offer would not have sufficed for their purposes.[9]   Given this context, there is no good reason to defer resolution of Plaintiffs' failure-to-patrol claim.   Accordingly, Plaintiffs' request to conduct jurisdictional discovery on this claim will be denied.

In sum, the discretionary function exception to the FTCA immunizes the United States from any claims grounded in the alleged failure of NPS to patrol the Parkway.   To the extent that Count Five asserts a negligence claim based on this theory, it will be dismissed for lack of subject-matter jurisdiction.

---

[9] Plaintiffs' motion for leave to file surreply does not reference the Government's offer at all.   (*See generally* ECF No. 79).

### B.   Negligent Maintenance

Plaintiffs' negligent maintenance claim alleges that the Government violated its duty to "maintain the Parkway and its lands adjacent thereto" with respect to two different components of the Parkway's drainage system.  (ECF No. 44 ¶ 49).  First, Plaintiffs allege that (1) "[f]or some period of time prior to January 20, 2009, . . . the United States [did not perform] periodic or any meaningful inspection or maintenance of the storm drain" above the Parkway; and (2) the storm drain had a "breach" that allowed water to escape and flow down to the Parkway on the date of the accident.  (*Id.* ¶¶ 23, 26).  Second, Plaintiffs allege that (1) "[f]or some period of time prior to January 20, 2009, the United States performed no periodic or any meaningful inspection or maintenance of the ditch and drainage outlets" abutting the Parkway near the accident site and (2) the water that escaped from the storm drain flowed across the drainage ditch and onto the Parkway.  (*Id.* ¶¶ 24, 26).  As further simplified in Plaintiffs' opposition, the conduct of the Government that is at issue in Plaintiffs' negligent maintenance claim is its alleged "failure to fix a hole in a storm drain" and its alleged "failure to keep a small portion of a roadside drainage ditch clear."  (ECF No. 59, at 20).

Thus, with respect to the first prong of the discretionary function exception, the relevant inquiry is whether there is any

14

statute, regulation, or policy that requires the NPS to maintain its storm drains and drainage ditches in a *specific* manner.   *See Baum*, 986 F.2d at 721; *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997).   As before, the Government argues that no such mandatory statute, regulation, or policy exists.   (ECF No. 42-1, at 12) (internal quotation marks omitted).   Unlike with the previous theory of negligence, however, Plaintiffs identify three potential sources.

First, they point to 16 U.S.C. § 1a-8(a)(3).   (ECF No. 59, at 15).   That statute reads, in relevant part:

> [T]he National Park Service shall implement a maintenance management system into the maintenance and operations programs of the National Park System.   For purposes of this section the term "maintenance management system" means a system that contains but is not limited to . . . a description of work standards including frequency of maintenance, measurable quality standard to which assets should be maintained, methods for accomplishing work, required labor, equipment and material resources, and expected worker production for each maintenance task . . . .

16 U.S.C. § 1a-8(a)(3).   The plain language of this provision defeats Plaintiffs' position, however.   At best, this statute only establishes that the decision of whether to have a maintenance management system is non-discretionary.   It does not provide any specific directives regarding the day-to-day maintenance of the Parkway and certainly does not require NPS to

maintain the storm drains and drainage ditches alongside of the Parkway in any specific manner.  If anything, this statute *supports* the Government's contention that the maintenance of its park system is a discretionary function because it appears to delegate to the NPS the details of actually carrying out that process.[10]

Second, Plaintiffs rely on 23 C.F.R. §§ 970.204 and 970.212.  (ECF No. 59, at 15).  Like 16 U.S.C. § 1a-8(a)(3), however, these regulations require only that the NPS "develop, establish and implement" a "federal lands safety management system," which includes "procedures for . . . [r]outinely maintaining and upgrading safety appurtenances including highway-rail crossing warning devices, signs, highway elements, and operational features."  *See* 23 C.F.R. §§ 970.204, .212(c)(2)(i).  The regulations do not set forth specific, mandatory rules for the manner in which NPS is supposed to maintain the drainage systems under its purview.

Third, Plaintiffs cite to two sections of a document with the subject line "Park Road Standards."  (ECF No. 59, at 16; ECF

_____

[10]  Moreover, the Government included with its reply "Director's Order #80:  Real Property Asset Management," which actually "establish[es] the NPS policies, requirements, and standards for implementing" 16 U.S.C. § 1a-8(a)(3).  (*See* ECF No. 75-4, at 3).  This document does not prescribe the manner in which the NPS must maintain the Parkway or the national park system.

No. 59-10, at 1).[11]   As Plaintiffs observe (*see* ECF No. 59, at 16), the Park Road Standards state:   "Cut sections should be designed to provide for adequate ditches or other drainage features to ensure positive drainage.   The ditch must be large enough to accommodate the design flows and deep enough to provide for satisfactory drainage of the pavement base." (ECF No. 59-10, at 38).[12]   This section contains requirements for the *design* of drainage systems and does not speak to the inspection, maintenance, or repair thereof. (*See* ECF No. ¶¶ 49, 51). Because Plaintiffs' claim is not one for negligent design, the section of the Park Road Standards addressing the design of cut sections is not applicable.

By contrast, Plaintiffs' reliance on a second provision of the Park Roads Standards, set forth below, is well-taken:

> Road safety and efficiency of operation
> depend on adequate levels of cyclic and
> preventative maintenance and repair, which
> are also essential to protect the extensive
> capital investment [of NPS] in the physical
> facility constituted by park roads, parkways
> and bridges.   Consequently, park roads shall
> be maintained *to the standards to which they
> have been constructed or reconstructed*, and

---

[11] Citations to the Park Road Standards refer to the CM/ECF pagination.

[12] A "cut section" is "[t]hat part of the roadway which, when constructed, is lower in elevation than the original ground." (ECF No. 59-10, at 45).

in a condition that promotes safety and
protects capital investment.

(*Id.* at 43) (emphasis added).  Thus, the NPS is required by the

Park Road Standards to maintain its "roads" – defined to include

"the entire area within the right-of-way" – in a *specific*

manner:  in accordance with "the standards to which they have

been constructed or reconstructed." (*Id.* at 43, 48).  *Cf. ARA*

*Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir.

1993) (holding that a policy requiring "that park roads 'conform

to the original grades and alignments' and that graded roads be

'firm, [and] of uniform cross section'" was a sufficiently

specific standard to which to hold the NPS (alteration in

original)).[13]  As set forth above, Plaintiffs' theory of

negligent maintenance is premised on the alleged failure of the

Government to perform any "periodic" or "meaningful" maintenance

to keep two components of its drainage system in working order.

Although Plaintiffs admit to needing discovery to ascertain the

_____

[13] The existence of the Park Road Standards renders the
Government's reliance on *Baum v. United States*, 765 F.2d 716 (4th
Cir. 1993) unavailing.  In *Baum*, the plaintiffs contended that
the NPS "was negligent in designing and constructing the bridge
guardrail in question" and "failed to maintain the guardrail
system." *Id.* at 721.  As to both claims, the Fourth Circuit
explicitly found no mandatory law governing either function.
*Id.* at 722.  Therefore, the issue in *Baum* concerned the second
prong of the discretionary function exception of the FTCA.
Here, the court need not reach the second prong because there is
a policy dictating the actions of NPS.

precise standards of construction or reconstruction for the Parkway's drainage system (ECF No. 59-1 ¶ 10), such standards certainly required the storm drain to be free from holes and the drainage ditch to be capable of draining water.[14]   Furthermore, the cited provision does not condition the maintenance requirement on the availability of funds.   *Cf. Walters v. United States*, 474 F.3d 1137, 1139 (8th Cir. 2007) (observing that a regulation requiring the Bureau of Indian Affairs to preserve a road "as nearly as possible in the as-built condition" would satisfy the first prong of the discretionary function exception but for a related regulation that explicitly conditioned such maintenance on the availability of funds).   Thus, the Park Road Standards unequivocally require the type of maintenance that Plaintiffs allege did not occur and therefore constitute a

---

[14] In its reply, the Government raises two factual issues in an apparent effort to avoid this conclusion.   First, by reference to a second declaration of Jon James, the Government contends that the build-up of debris in a drainage ditch cannot be remedied through ordinary maintenance but instead requires comprehensive "reconstruction" as part of a long-term facilities management project.   (ECF No. 75, at 14-15).   Second, the Government posits that "the United States does not own the storm drain – and, therefore, is not responsible for its maintenance or operation."   (ECF No. 75, at 21).   Because the Government did not raise either of these issues with any clarity in its opening brief, the issues will not be addressed at this time.   *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").   Furthermore, such issues are properly the subject of discovery.

mandatory policy for purposes of the first prong of the discretionary function exception.

The Government maintains that the Park Road Standards do not satisfy the first prong of the discretionary function for two reasons.  First, the Government contends that the Park Road Standards are inapplicable to the Parkway, which was constructed prior to 1984, the effective date of the document.  (ECF No. 75, at 12-13).  Second, the Government maintains that, even if they are applicable, the Park Road Standards do not remove the discretion that NPS has to manage the Parkway and its drainage system.  (*Id.* at 11-12).  Each of these arguments is unavailing.

As to the applicability of the Park Road Standards, the Government concedes that the document would apply "as existing park roads are reconstructed or when new roads are constructed" after 1984, when the Park Road Standards were adopted.  (ECF No. 75, at 12; *see also* ECF No. 59-10, at 3).  The Government insists, however, that the Park Road Standards do not apply to the Parkway because the Parkway was constructed prior to 1984 and since then has only been subject to one resurfacing project. (ECF No. 75, at 12-13).  At this stage, however, the applicability of the Park Road Standards cannot be precluded. The admitted resurfacing project may well have brought the Parkway within the scope of the Park Road Standards. Furthermore, when confronted with the same argument that the

Park Road Standards do not apply to older roads, at least one circuit court specifically rejected that notion:  "We find this argument unconvincing, both because it seems to suggest that the Standards are entirely irrelevant to a major access road in a major national park and because it implies that the Standards' objective safety specifications have no bearing on the safe maintenance of pre-existing roads."  *Soldano v. United States*, 453 F.3d 1140, 1149 (9th Cir. 2006).  The decision in *Mitchell v. United States*, 225 F.3d 361, 364 (3[d] Cir. 2000), is not to the contrary.  There, none of the plaintiffs' claims involved negligent maintenance.  Instead, the Government relied on the Park Road Standards in arguing that its decision regarding how and when to reconstruct or repair a state roadway ceded to the United States prior to 1984 was discretionary.[15]

The Government argues in the alternative that, even if the Park Road Standards apply to the Parkway, Plaintiffs ignore the full context of the Park Road Standards, which, according to the Government, bestow complete discretion on the NPS in managing the parks system and roads.  (*See* ECF No. 75, at 11-12).  The Government quotes extensively from the Preface of the Park Road

---

[15] Additionally, Plaintiffs point out that the Park Road Standards are specifically referenced in the *Management Policies 2006* of NPS.  (*See* ECF No. 59, at 16).  As noted earlier, the Government cited to this policy manual in defense of its stance that patrolling the Parkway is a discretionary matter.

Standards to show that they do not impose any specific prescriptions on the NPS, but these statements do not address the *maintenance* of a roadway as Plaintiffs' selected provision does.  For example, "[t]he standards contained herein provide flexibility *in the planning and design processes* to allow for consideration of variations in types and intensities of park use, for wide differences in terrain and climatic conditions, and for protection of natural and cultural resources in National Park System areas."  (ECF No. 59-10, at 3) (emphasis added). Elsewhere, the Preface reads:

> The criteria presented have been adapted from available design standards to meet the unique requirements of park roads.  This will provide a framework within which *design and construction* of park roads should be conducted; however, this document is not intended to encompass a level of detail comparable to that normally found *in design manuals*.

(*Id.*) (emphases added).  And finally, it states:  "*On resurfacing, restoration and rehabilitation (3-R) projects* [the standards] will be utilized to the extent practicable and feasible."  (*Id.*) (emphasis added).  In other words, the discretion that the Park Road Standards provide to the NPS concerns functions such as design, construction, and reconstruction – not the maintenance of roadways.  This interpretation of the Park Road Standards is wholly in line with the reading by various circuit courts.  *See Soldano*, 453 F.3d at

1150 ("[I]t does not follow that the Standards' basic, scientific safety specifications may be disregarded, particularly those that do not require redesigning or reconstructing the [roadways]."); *see also Mitchell*, 225 F.3d at 364 ("Under these guidelines, the Park Service's decision *about how and when to reconstruct* Route 209 would seem to be a discretionary decision . . . .").[16]   Thus, although some provisions within the Park Road Standards may provide for flexibility, that flexibility does not apply to the maintenance of the Parkway.

All in all, on this theory of negligence, i.e., failure to maintain the storm drain and drainage ditch in working order, Plaintiffs have satisfied their burden with respect to the discretionary function exception to the FTCA by showing that "the governmental action complained of" did not "involve[] an element of judgment or choice" by virtue of the maintenance mandate set forth in the Park Road Standards. *Baum*, 986 F.2d at

---

[16] In addition to *Mitchell*, the Government relies on *Cope v. Scott*, 45 F.3d 445 (D.C. Cir. 1995), as an example where the court interpreted the Park Road Standards as providing discretion to the NPS in its operations.  The *Cope* court looked only at the Preface's use of the phrase "to the extent practicable" to deduce that *all* of the Park Road Standards are non-mandatory.  *Id.* at 450.  As noted above, however, when read in context, this phrase concerns "resurfacing, restoration and rehabilitation (3-R) projects," not maintenance.

720.  Therefore, the second prong of the discretionary function exception need not be reached.

## III. Summary Judgment

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).  At the same time, the court must construe the facts that are presented in the light most

favorable to the party opposing the motion.   *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

To prove negligence under Maryland law, a plaintiff must show that:  (1) the defendant was under a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury or loss; and (4) the loss or injury proximately resulted from the defendant's breach of the duty.   *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999).   The Government asserts that judgment is warranted in its favor regarding the failure-to-maintain claim because there is no evidence that the clogged drainage ditch[17] caused the icy condition of the Parkway.  (ECF No. 42-1, at 21-22).[18]

---

[17] In its motion, the Government focuses its attention only on the drainage ditch abutting the Parkway and not on the storm drain above the Parkway.  (*See* ECF No. 42-1, at 8). Confusingly, the Government sometimes refers to the drainage ditches as "storm drains." (*See id.* at 12).  It is clear from the Government's descriptions, however, that its argument is intended to apply to the drainage ditches. (*See, e.g., id.* at 22 n.11 ("[T]he storm drains are situated in a flat, flush orientation with the road surface . . . .")).   Indeed, Plaintiffs construe the Government's argument as such.  (ECF No. 59, at 19, 26).

As noted above, the contested ownership of the storm drain is raised by the Government for the first time in its reply brief and will not be considered at this time.  *See Clawson*, 451 F.Supp.2d at 734.   Regardless, and as Plaintiffs note in their motion to file a surreply, that issue is best developed through discovery.

[18] The Government's argument regarding actual or constructive notice of the icy condition (ECF No. 42-1, at 14-

"To be a proximate cause for an injury, the negligence must be (1) a cause in fact, and (2) a legally cognizable cause." *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (internal quotations omitted).    Causation-in-fact refers to the requirement that the defendant's conduct actually produce an injury.   *Id.* at 244.    Depending on the situation, there are two tests for determining if causation-in-fact exists:   the "but for" test and the "substantial factor" test.   *Id.*   "The 'but for' test applies in cases where only one negligent act is at issue . . . ."   *Id.*   "When two or more independent negligent acts bring about an injury, . . . the substantial factor test controls.   Causation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries."   *Id.*

Here, there were potentially multiple, independent events that led to the underlying car accident that killed Joseph Quigley and injured Ms. Ochoa and Ms. Barbosa.   Therefore, when the Government argues that "[t]he United States played no role whatsoever in these events" (ECF No. 42-1), it in essence contends that the alleged failure to maintain the drainage ditch was not a substantial factor in producing the accident.

---

20) is moot because the FTCA bars the negligent patrol/failure to warn claim.

Plaintiffs, however, have adduced contrary evidence.  They point to the Declaration of Christopher Brown, which states:

> The portion of the drainage ditch between the base of the retaining wall and the travel lanes of the [Parkway] appears to have become filled over time with silt and vegetation, such that there was no longer any appreciable channeling to the horizontal inlets.  There did not appear to have been any maintenance work to keep the ditch clear for a significant period of time

(ECF No. 59-7, Brown Decl., ¶ 5).  Taken in the light most favorable to Plaintiffs, this evidence suggests that the clogged condition of the drainage ditch contributed to the pooling of the water on the Parkway, which eventually froze into the ice patch that led to the accident.  Therefore, a triable fact exists regarding whether the Government's negligence was a cause-in-fact of Plaintiffs' injuries.

The second requirement to show proximate cause — that the negligence is a legally cognizable cause — requires the court "to consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Pittway Corp.*, 409 Md. at 245.  "The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Id.* at 246.  Here, the Government argues that "[t]he United States cannot be held liable for the unexpected volume of flooding water . . . cascading from such a focused source on

27

non-government property at the top of the hill, down the hillside, over the stone retaining wall and across the roadway before freezing." (ECF No. 42-1, at 22). The Government ignores the crucial issue, however. Regardless of the initial source of the water, the NPS may nonetheless be responsible for water that collects on the Parkway because it allegedly failed to keep the drainage ditch clear of debris. *See Jennings v. United States*, 291 F.2d 880, 887 (4th Cir. 1961) (observing that the United States may be liable for negligently maintaining a drainage ditch, the inadequacy of which may have contributed to an icy patch on the roadway); *cf. True v. Mayor of Westernport*, 196 Md. 280 (1950) (holding a municipality liable for negligently maintaining a sewer where, despite "extraordinary rainfall," the unclogged sewer may have prevented damage to the plaintiff's property). The potential consequences of an unmaintained drainage ditch is well within the "field of danger" that the NPS should have anticipated.

Accordingly, the Government's motion as to this claim will be denied.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss or, in the alternative, for summary judgment filed by Defendant the United States of America will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
